UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ORRICO,

                    Plaintiff(s),

     v.

ALLIANT FOODSERVICE, et al.,

                    Defendant(s).

NO. C02-1250P

ORDER RE:
1. BURDEN OF PROOF
2. EARNOUT PROVISION

     The above-entitled Court, having received and reviewed the briefing of the parties on the two above-cited issues, as well as all exhibits and declarations attached thereto, makes the following ruling:

     IT IS HEREBY ORDERED that Defendants shall bear the burden of proof on the issue of whether and to what extent the earnout amounts in the Stock Purchase Agreement would have been achieved had Defendants not breached the contract by rendering performance under the earnout provision impossible.

     THE COURT FURTHER FINDS that the "earnout provision" in the Stock Purchase Agreement contemplated a month-for-month extension in the event of any delays in the startup of the grind operation pursuant to § 1.4(g) of the Agreement.

**BACKGROUND**

     Plaintiffs owned a meat company which they sold to Defendants; part of the purchase price was an "earnout provision" which tied additional payments to the performance of the purchased meat operation for a period of time. The maximum "earnout" was $7.2 million. This Court awarded summary judgment to Plaintiffs based on a finding that Defendants' termination of the meat grinding operation had rendered it impossible for Plaintiffs to achieve any of the goals necessary to attain the earnout, and further found that Defendants had breached the purchase agreement and awarded

**ORD ON MTNS - 1**

1  Plaintiffs the maximum amount of damages – $7.2 million.  Order on Summary Judgment, 6/6/03 (Dkt.

2  No. 286).

3         In reviewing the case on appeal, the Ninth Circuit upheld the determination that Defendants

4  had breached the contract.  The appellate court took exception, however, to the $7.2 million award,

5  stating that Plaintiffs were not automatically entitled to the full benefit of the condition precedent

6  without proof that the earnout threshold would or would not have been attained absent Defendants'

7  frustration of the condition.  In the language of the opinion:

8              . . . the district court should have considered whether Appellees could have        attained
             any payment under the Earnout Provision, even if Appellants had                not
9            breached the contract.  The record demonstrates that genuine issues of      material
             fact exist concerning this question that cannot be decided on a motion        for
10           summary judgment.  Opinion (USCA No. 3-35516), p. 5.

11        The matter was remanded to this Court on that issue and both parties have briefed their

12  positions regarding who bears the burden of proof on the question.  The parties have also requested a

13  ruling from the Court on the length of the "earnout period" in the event of any delays in the startup of

14  the grind operation which was to produce the revenue and the "synergies" upon which the earnout

15  amount was to be calculated.

16        §1.4(g) of the Agreement states that "Earnout Period: means the 2001 Fiscal Year or the 2002

17  Cumulative Fiscal Period, as the context may require."  "2001 Fiscal Year" is defined as "the period

18  commencing on the Closing Date and ending December 29, 2001;" the "2002 Cumulative Fiscal

19  Period" is defined as "the period commencing on the Closing Date and ending December 28, 2002."

20        The earnout provision was structured to base the contingent payments on two income

21  measurements: Earnings Before Interest, Taxation and Amortization ("EBITA") and Product Margin

22  Income ("PMI").  After defining EBITA and how it is to be calculated, §1.4(g) goes on to add:

23

24

25

26  ORD ON MTNS - 2

> *...provided further*, that if any of the capital equipment to be installed and operational at the Company by September 1, 2001 for the purpose of achieving certain synergies with respect to ground beef production capacity, is not installed and operational by that date through no fault of the Company or any of the Sellers, or if there are any commercially unreasonable delays by the buyer in complying with the Buyer's obligations as described in Section 1.4(f)(ii), then the Buyer and the Sellers' Representative will adjust "Actual EBITA" such that for each month's delay in the start-up of such capital equipment after September 1, 2001, or in the compliance by the Buyer with Section 1.4(f)(ii), as the case may be, one month's credit toward achieving synergies attributable to such equipment or such compliance will be factored into the calculations of "Actual EBITA."

Decl. of Christina L. Haring, Ex. 5, p. 7.

The parties disagree over the meaning of the phrase "that for each month's delay. . . one month's credit toward achieving synergies. . . will be factored into the calculations of the 'Actual EBITA.'"

The Court also notes that, according to a Statement of Facts previously filed by Plaintiffs:

> Alliant terminated the frozen grind shortly after it commenced in September, 2001, then restarted the grind in October 2001 [*citation omitted*].  After [U.S. Foodservice] acquired Alliant in November 30, 2001, the frozen grind was immediately and permanently terminated. [*citations omitted;* emphasis in original].

Pltfs' Mtn for S/J (Dkt. No. 165), pgs. 8-9.

## DISCUSSION

### Burden of Proof

Both parties claim that the Ninth Circuit opinion holds that the *other* party has the burden of proof – both parties are wrong.  The opinion is completely silent on that point.  It does, however, point the way to resolving the issue.  First, the appellate court cites to a 1927 case, Windsor Investing Corporation v. T.J. McLaughlin's Sons, 225 N.Y.S. 7 (N.Y. Sup. Ct. 1927), aff'd, 229 N.Y.S. 926 (N.Y. App. Div. 1928)[1], which held

> [t]he general rule is unquestioned that prevention by the Defendant of the performance of a condition precedent excuses the nonperformance of the condition;

---

[1] Under the terms of the Agreement, the contract is controlled by New York law.

but it must be shown that the nonperformance was actually due          to the behavior of the Defendant.  If the condition would not have happened,    whatever the Defendant's conduct, the condition is not dispensed with.          Williston on Contracts, §677.[2]

Id. at 10.  Plaintiff in this case was a broker, half of whose commission was conditioned upon the delivery of the deed by the Defendant seller and payment of the purchase price by a third party purchaser.  *Through no fault of the seller* (an important distinction here), the sale did not go through and Plaintiff lost half his commission.  Purchaser sued seller in a separate action which was then settled out of court without a sale of the property.  Plaintiff broker sued the seller on the theory that, by settling the other litigation, seller prevented the performance of the condition upon which the second half of his commission was payable.

The Windsor court went on to say that

[a]s the Plaintiff was not to have the second installment of its commission          until the passing of title, it must show either that title has passed, or that it          would have passed, but for the action of the Defendant preventing it. [*citation*].

Id. at 11.  Defendants would like the Court to assume on that basis that it is Plaintiffs' burden of proof in our case to establish that they would have reached the earnout threshold had the grind not been canceled.  The problem with that assumption is that, in the Windsor case, the Defendant was not the party who frustrated performance by rendering the condition precedent impossible – it was the third party purchaser ("In the present case, the facts now before the court do not show that the event upon the happening of which the plaintiff's commission was payable was frustrated by any action of the Defendant. . . It was because of the purchaser's default that title did not pass." Id.)

---

[2] Plaintiffs claim that this section of Williston states that "a Defendant who frustrates performance could not argue against recovery unless he or she proves there was no possible way that the condition precedent would have occurred even absent the Defendant's actions." Plaintiffs' Brief., p.11. Although the Court does not read §677 of Williston that way,  the Windsor court's language – "If the condition *would not have happened*,         whatever the Defendant's conduct, the condition is not dispensed with" – is couched in syntax which suggests         that the breaching party bears the burden of proof.

ORD ON MTNS - 4

1    In fact, because it was the purchaser who caused the default, "the condition would not have

2    happened, whatever the Defendant's conduct," and the plaintiff in Windsor was out of luck.  But that

3    is not the position of Plaintiffs in this case, and Windsor, while it stands for the proposition that

4    damages based on frustration of a condition precedent may not be awarded absent proof that the

5    condition would not have happened in any event, does not define the burden of proof under the

6    circumstances in our case.[3]

7    The second authority cited by the Ninth Circuit is the Restatement (Second) of Contracts:

8    See also Restatement (Second) of Contracts § 245 cmt. b (stating that 'if it
     can be shown that [a] condition would not have occurred regardless of the
9    lack of cooperation,' the rule excusing non-occurrence if a party's breach
     by non-performance contributed materially to the non-occurrence does not
10   apply).

11   USCA Opinion, p. 4.  For some reason, the appellate court did not go on to quote the remainder of the

12   comment: "The burden of showing this is properly thrown *on the party in breach.*" (emphasis

13   supplied).

14   Defendants argue that Comment "b" to Restatement § 245 "applies to whether or not a

15   condition precedent has been frustrated, establishing breach as opposed to damages." Defendants'

16   Response Brief, p. 4.  This is a poor argument.  In the first place, this Court had already ruled (and the

17   Ninth Circuit had affirmed) that the condition precedent had been frustrated and the contract breached,

18   therefore the appellate court would not have been citing the Restatement on that issue.  Secondly, the

19   "this" that the comment refers to (i.e., "[t]he burden of showing *this*") is "that the condition would not

20   have occurred regardless of the lack of cooperation."  This is the burden of proof on *damages* and by

21   the language of the comment, it falls on "the party in breach;" i.e., Defendants.

22

23

24   [3] Plaintiffs cite a string of post-Windsor cases where plaintiff-brokers were awarded commissions based
     on conditions precedent which were frustrated by Defendant-sellers.  Defendants correctly point out that these
     cases do not stand for the proposition that the defaulting sellers had the burden of proof; what is significant
25   about the cases is that in none of them were damages conditioned on plaintiffs carrying the burden of proof
     (as would be expected if Defendants are right about the effect of Windsor).

26   ORD ON MTNS - 5

1    Defendants also erroneously claim that Illustration 6 of Restatement § 245 (which illustrates

2    Comment b) supports placing the burden of proof on Plaintiffs.  The scenario is: A contracts to sell its

3    manufacturing operation to B, who agrees to pay A $500,000 plus a $100,000 bonus if profits for the

4    first year exceed a specified amount.  Six months later, B sells the plant to C who shuts it down.  B

5    refuses to pay the bonus.  "Whether A has a claim against B depends on whether B's failure to operate

6    the plant for a year is a breach of his duty of good faith and fair dealing which contributed materially to

7    the non-occurrence of the condition."  Restatement 2d, §245, p. 260.

8    Analogizing to the fact pattern of this case, "A" = Plaintiffs, "B" = Defendants.  The

9    illustration goes on to state:

10
        The fact that A cannot show that the profits would otherwise have exceeded
        the stated amount does not prevent him from recovering.  If, however, <u>B
11      shows that they would not have exceeded that amount</u>, A cannot recover.

12   Restatement (Second) of Contracts § 245 at 259-60 (1981) (emphasis supplied).  There is no other

13   way to read this language than placing the burden of proof on Defendants.

14   Defendants cite two other New York cases which appear to shift the burden favorably away

15   from them.  In <u>E.I. DuPont De Nemours Powder Co. v. Schlottman</u>, 218 F. 353 (2nd Cir. 1914),

16   Defendant bought a manufacturing plant from Plaintiff with the understanding that if after operating it

17   for a year it had produced goods at a certain cost, buyer would pay an additional $25,000 to Plaintiff-

18   seller.  Six months after he bought the plant, Defendant sold it.  The Court upheld both the trial court's

19   finding of an implied promise to keep the plant open for a year and its award to Plaintiff of an

20   additional $25,000.  Defendants fasten on this language:

21
        But the Defendant has made performance impossible by selling the plant          within
        the period of one year to a purchaser who has dismantled it. . .          Because the
22      Defendant has made the performance of this test impossible,          the Plaintiff
        should not be remediless.  We think he had the right to show,          if he could,
23      in other ways, that the value of the plant was greater by $25,000          than the sum
        paid for it.  <u>Id.</u> at 355.

24

25

26   **ORD ON MTNS - 6**

But, as Plaintiffs point out, the DuPont award was not based on proof that the plant would have produced the goods at the price agreed had Defendant not rendered that test impossible. The only burden assigned to Plaintiff was to show that the plant, *at the time of sale*, was worth $175,000, not just $150,000. This is known as an award for *quantum valebat* (Black's Law Dictionary, 6th Ed. definition: "as much as they were worth") and it is not the basis of the calculation for the earnout provision in the instant case.

In fact, after reviewing every case that cites DuPont, it is significant to note that none of them cite it for the proposition that the non-breaching party bears the burden of proof that a condition precedent would have been achieved in the absence of the breaching party's conduct rendering that condition impossible. The only case that mentions burden of proof states:

> Nevertheless, if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not substantially contribute to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach.[FN32]
> ******
> FN32. The drafters of the Restatement cite the following cases as authority for their rule: Foreman State Trust & Savings Bank v. Tauber, 348 Ill. 280, 180 N.E. 827, 830 (1932); Vanadium Corp. v. Fidelity & Deposit Co., 159 F.2d 105, 109-110 (2d Cir. 1947); E. I. Dupont de Nemours Powder Co. v. Schlottman, 218 F. 353 (2d Cir. 1914).

Shear v. National Rifle Ass'n of America, 606 F.2d 1251, 1257 (C.A.D.C., 1979).

DuPont does not support Defendants' position. Defendants' other case, Kotcher v. Edelblute, 250 N.Y. 178 (1928), does not avail them either. The circumstances and even the deciding legal principles are inapposite of the situation in the case before the Court. Edelblute is not an "impossibility of performance" case, but rather a case "where the other party to the contract has unequivocally declared by word or act that performance of the condition precedent will not secure performance of the counter-promise." Id. at 183. The plaintiff in Edelblute was not prevented from performing (as the Orrico plaintiffs were), he simply elected not to perform based on certain actions of the defendants

1  and the Court laid upon him the burden of showing what he would have received had he chosen to

2  perform.  That is not the circumstance of this case.

3          Interestingly, Defendants also cite a Washington case, <u>Puget Sound Corp. v. Bush</u>, 45

4  Wn.App. 312 (1986), which in fact supports Plaintiffs' position.  Defendants cite the language of the

5  opinion which holds that, in a contract where a defendant's obligation is only triggered by plaintiff's

6  performance of a condition precedent, plaintiff has the burden to show either performance or excuse

7  for non-performance.  That particular rule is well-established, but it is irrelevant to this issue.

8  Plaintiffs' performance has already been excused by this Court's finding that Defendants breached the

9  contract by rendering performance impossible.  The <u>Puget Sound</u> court went on to state:

10          Once excused, Puget Sound had no reason to pursue the required financing
           and should not be expected demonstrate its availability now.  *The burden*
11          *was more properly on the Bushes*. . . Comment b [of Restatement 2nd]
           indicates that the burden of demonstrating that their repudiation did not
12          contribute materially to the non-occurrence of the condition precedent was
           on the Bushes.

13
   <u>Id.</u> at 318 (emphasis supplied).  New York, not Washington, law is controlling in this case, but this
14
   opinion certainly adds some weight to the conclusion that Defendants bear the burden of proof on the
15
   issue of whether, absent their prevention of performance by Plaintiffs, the earnout provision thresholds
16
   would not have been attained anyway.
17

18 **Earnout Provision**

19          Despite having initially identified the issue to be decided as "the length of the earnout period,"

20 the parties actually briefed and argued a number of issues: the earnout period, the meaning of the word

21 "credit" in §1.4(g), whether what Alliant and USF did to the grind operation post-sale constituted a

22 "delay" or a "termination," the meaning of the term "synergies" in §1.4(g), and whether Plaintiffs are

23 automatically entitled to the PMI payout of $720,000.  This ruling, in accordance with the issue

24 framed by the parties at the outset, will be confined to settling the question of what constitutes the

25 "earnout period" – specifically, the meaning of the contractual language regarding the effect of any

26 **ORD ON MTNS - 8**

1   delay in the startup of the grind operation.  That ruling will necessarily entail drawing a distinction

2   between "delay" (which invokes the disputed language of §1.4(g)) and "termination" (which invokes

3   the remedies for contractual breach which are addressed in the "burden of proof" section of this

4   opinion *supra*).

5        Plaintiffs offer the testimony of persons on both sides of this litigation who were involved in

6   drafting the Agreement (*see* Dkt. No. 358, Declaration of Gavin Skok; Declaration and Deposition of

7   Frank Patton [Ex's D and I], Deposition of Brian Orrico [Ex. H], Deposition of David Enger [Ex. M])

8   – based on that evidence, there seems little doubt that the intent of the drafters of the document was

9   that there would be a month-for-month extension of the earnout period for every month of delay in the

10  startup of the grind.  Defendants argue that since §1.4(g) is unambiguous and the contract is fully

11  integrated, New York law prohibits the use of parol evidence to supplement the terms of the document

12  and Plaintiffs' evidence is therefore inadmissible and irrelevant.

13       What Defendants argue that the disputed section "unambiguously" means is that, in the event

14  of delay in the grind startup, a "credit" shall be given in the calculation of the EBITA.  Although they

15  attempt to distinguish "credit" from "the purported month-for-month extension for delay" which

16  Plaintiffs are advocating, Defendants are forced to admit that "[c]alculating the credit that is referred

17  to in Section 1.4(g) is not so simple.  Unlike the Earnout Period, the Agreement provides no definition

18  or instruction on how this calculation of a credit to Actual EBITA is to be made."  Defs' Opening

19  Brief, p. 13.

20       This is an extremely weak position.  It is simply not credible to argue to that the Agreement is

21  an unambiguous, fully integrated document on the one hand, but on the other hand is completely silent

22  when it comes to the definition or procedures for a critical contingency provision.  As Plaintiffs point

23  out, what Defendants are really saying is that the contract is ambiguous on the issue of what a "credit"

24  is, which brings the analysis back around to the parol evidence rule and Plaintiffs' array of evidence

25

26  **ORD ON MTNS - 9**

1  that what the document means is that a month-for-month extension was contemplated for each month

2  of delay in the startup of the grind.

3      There are two ways to analyze the document and both of them arrive at Plaintiffs' position.

4  The Court finds that the contract is unambiguous on its face and that it says (and means) precisely

5  what Plaintiffs claim.  Second, even if we accept Defendants' position that the Agreement does not

6  mean what it appears to say, then the Court is presented with a contract with an ambiguous term

7  which permits resort to parol evidence to further delineate its meaning.  The parol evidence before this

8  Court supports Plaintiffs' position.

9      Having ruled in Plaintiffs' favor, it is not entirely clear how sizeable a victory they have

10  obtained.  The only "delay" which the grind operation appears to have experienced was the period

11  from April 2001 (the Closing Date) to September 2001 when the grind operation started up.  This

12  "delay" appears to have been contemplated by the language of § 1.4(g) of the Agreement and thus not

13  to invoke the "month-to-month extension" contingency..  From September through November, the

14  grind was arguably operational[4], then in December 2001 USF ordered the operation terminated (the

15  action which has previously been ruled a contractual breach).  From the point at which the grind was

16  terminated, the calculations of what is owed Plaintiffs (if anything) fall into the category of "damages

17  arising out of breach of contract," and would not be calculated under any formula involving a "delay"

18  of the grind operation.[5]

19  _____

20      [4]  Plaintiffs attempt to take the position that what the Defendants are calling the September 2001
   "startup"      was really nothing more than a "test run" which should not qualify as the start of the grind.  That
21  argument is        severely undercut by their own prior pleadings; as the quote from Plaintiffs' Motion for
   Summary Judgment          (supra, p. 3) indicates, they characterized the September 2001 event as the startup
22  of the grind operation also.        However, the Court does not need to resolve that issue to reach the ruling
   requested by the parties here.

23

24      [5]  The American Heritage Dictionary defines "delay" as "[t]o postpone until a later time."  No one has
   argued that, once shut down, there was ever a possibility that Plaintiffs' grind operation was going to start up
25  again.  The contractual provisions regarding delay are simply inapplicable post-December 2001.

26  **ORD ON MTNS - 10**

1   As mentioned at the outset of this analysis, there are copious amounts of analysis brought to

2   bear on issues which are not properly before the Court at this time.  Plaintiffs devote a considerable

3   amount of briefing to the calculation of what "credit" they are entitled to in the event of a termination

4   of the grind (as opposed to "delay").   That is a completely separate issue from the determination of

5   "length of earnout period" upon which the parties originally requested the Court to rule.    Similarly,

6   Plaintiffs' attempt to win a ruling that they are "automatically" entitled to their earnout under the PMI

7   formula contained in the SPA is beyond the scope of this series of briefs.  If rulings on those issues are

8   necessary to the resolution of this case, they should be plead and briefed separately and properly.

9   **CONCLUSION**

10   Based on the documents, evidence and case law presented in these rounds of briefing, this

11   Court finds that Defendants in this case bear the burden of proof on the issue of whether (and to what

12   extent) Plaintiffs would have been able to attain the amounts of revenue necessary to trigger the

13   earnout provisions of the Stock Purchase Agreement in the absence of Defendants' actions which

14   rendered their performance impossible.

15   The Court further finds that the contract contemplated a month-for-month extension in the

16   event of any delay in the startup of the grind operation which was at the heart of the earnout provision

17   of the Agreement.

18

19   The clerk is directed to provide copies of this order to all counsel of record.

20   Dated:  January __3__, 2006

21

22   Marsha J. Pechman

23   U.S. District Judge

24   _____

25

26   **ORD ON MTNS - 11**